UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 00-12385PBS

| | |
|---|---|
| PALEY & TUCKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DOMINION TEXTILE, INC. and | ) |
| CHARGEUR'S TEXTILES, | ) |
| | ) |
| Defendants. | ) |

## ANSWER AND CROSSCLAIM OF DEFENDANT CHARGEURS TEXTILES S.A.

For its answer and crossclaim, defendant Chargeurs Textiles S.A. ("Defendant Chargeurs") states as follows:

1.     Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 1.

2.     Denied.

3.     Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 3.

4.     Defendant Chargeurs admits that the property for which this action has been filed is located at 51 Armstrong Road, Plymouth, Massachusetts.  All other allegations not admitted are denied.

5.     Defendant Chargeurs admits that a lease, dated October 25 of an unstated year, is attached to the Complaint. Defendant Chargeurs is without sufficient information to admit or deny the remaining allegations of this paragraph.

DOCKETED

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


DISABILITY LAW CENTER, INC.
        Plaintiff

            V.

                                        CIVIL ACTION: 00-10789-PBS

EMMA RIEL, et al.
            Defendants


## JUDGMENT


SARIS, U.S.D.J.                          February 7, 2001


The Court having allowed the plaintiff's motion for summary judgment on February 5, 2001, final judgment is hereby entered in favor of the plaintiff.


By the Court,

DEPUTY CLERK


judgment.sj



1UNITED STATES DISTRICT COURT<br/>
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABILITY LAW CENTER, INC.,<br/>    Plaintiff<br/><br/>      v.<br/><br/>EMMA RIEL, as guardian of<br/>LORETTA RIEL, and GERALD J.<br/>MORRISSEY, in his official<br/>capacity as COMMISSIONER OF<br/>THE DEPARTMENT OF MENTAL<br/>RETARDATION,<br/>    Defendants | )<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)<br/>)     CIVIL ACTION NO. 00-10789-PBS |

**MEMORANDUM AND ORDER**

February 5, 2001

SARIS, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Disability Law Center ("DLC") brings this action seeking injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and the Developmental Disabilities Assistance and Bill of Rights Act ("the Act"), 42 U.S.C. § 6000 _et seq._,[1] to compel the guardian of an adult mentally retarded woman, Loretta Riel, and the Commissioner of the Massachusetts Department of Mental

---

[1] After the hearing, 42 U.S.C. § 6000 _et seq._ was amended by the Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub. L. No. 106-402, 114 Stat. 1677, 1714, § 143(a)(1). Although the numbering and format of many of the statute's provisions have changed, the substance of the relevant amended statutory sections does not appear to differ in significant ways. I will continue to cite to the U.S. Code sections cited in the briefs and the case law.

_24_

Retardation ("DMR") to provide access to Ms. Riel's records.  As
the Protection and Advocacy system ("P&A") appointed by the state
of Massachusetts pursuant to the Act "to protect and advocate the
rights of individuals with developmental disabilities," 42 U.S.C.
§ 6042(a)(1), the DLC claims that it needs these records to
investigate an incident of alleged abuse, but that the guardian
has not consented to access.  The Commissioner has moved for
summary judgment on the ground that the guardian has the right to
refuse access pursuant to § 6042(a)(2)(I)(iii).  The plaintiff
has cross-moved for summary judgment.[2]

    After a hearing, Defendant Morrissey's Motion for Summary
Judgment is **DENIED**, and Plaintiff's Motion for Summary Judgment
is **ALLOWED**.

## II. BACKGROUND

    Loretta Riel[3] is a fifty-year-old woman with mental
retardation and other developmental disabilities, residing at the
Glavin Regional Center, an Intermediate Care Facility for the
Mentally Retarded operated by the Massachusetts Department of
Mental Retardation.  On the evening of December 31, 1998, staff

---

[2] The Court denies Plaintiff's Motion to Withdraw the Motion
for Summary Judgment, because the affidavit of Steven R. Hennigan
does not create disputed issues of material fact and because it
is tardy.

[3] With no disrespect meant to Ms. Loretta Riel or her
guardian, Ms. Emma Riel, I will refer to each woman by her first
name because the last names are the same.

at Glavin prevented Loretta from making a phone call to her family.  Upset at being denied the phone call, Loretta sat down on the floor.  Staff then put Loretta on a chair in the hallway.  Loretta threw herself out of the chair and put her foot under a laundry cart.  Staff then forcibly pulled Loretta away, causing her foot to be cut by the laundry cart, and dragged her from the hallway to her room on a blanket.

Believing that the actions of the staff constituted illegal restraint and abuse, the Glavin Human Rights Committee ("GHRC") filed an investigation complaint with the facility alleging illegal use of a restraint, mistreatment, and physical abuse, and requested reconsideration of the "Corrective Action Plan" portion of the report.  When the reconsideration request was denied, the GHRC filed an appeal with the Commissioner of the Department of Mental Retardation.  In March 1999, a second complaint was filed by the Human Rights Officer at Glavin.  According to Steven R. Hennigan, GHRC chairperson, "[t]his second investigation substantiated that mistreatment and emotional abuse occurred in the use of a number of restraints and other interventions which were systematically used when Ms. Riel exhibited difficult behaviors."  (Hennigan Aff. ¶ 7)  Just as with the first investigation report, the GHRC believed that the Corrective Action Plan from the second investigation also would not adequately protect Loretta from the possibility of future

3

mistreatment.   The reconsideration request was again denied, and the GHRC appealed to the Commissioner of the Department of Mental Retardation for the second time.

On August 12, 1999, the Glavin Human Rights Officer contacted the Disability Law Center, which is the Massachusetts Protection and Advocacy system, seeking representation for Loretta regarding the Corrective Action Plan appeal and related matters.   In turn, the DLC contacted Emma Riel, who is Loretta Riel's legal guardian and sister-in-law, once by telephone and three times by letter, explaining the DLC's role as the Massachusetts P&A system and requesting the guardian's permission to access Loretta's records for an investigation.   The DLC never received a response to its letters and, at one point, on December 15, 1999, was informed by the Human Rights Officer at Glavin that the guardian was refusing to sign the Release of Information form that had been sent to her by the DLC.

Emma Riel is an attentive guardian.   She visits with Loretta once a month and speaks with her by telephone between visits. Emma frequently contacts Glavin staff by telephone and inquires about Loretta's progress and care.   Emma also attends Loretta's annual team meeting, reviews her behavior plans, and visits her workshop at Glavin.   Emma asserts that after she discussed the December 1998 incident with members of the staff at Glavin and reviewed the investigation report and action plans concerning the

4

incident, she was satisfied that the matter "was handled in the best way by staff considering Loretta's condition and behaviors." (E. Riel Aff. ¶ 5.)   In addition, the guardian has concluded that "the investigation of the incident was adequately conducted and that Loretta's rights to be free from abuse and illegal restraint are not at risk. . . . Because [she] did not believe that further investigation was necessary and because [she] feel[s] that further investigation would be disturbing and harmful to Loretta, [Emma] chose not to sign the Release."  (E. Riel Aff. ¶¶ 5, 6.) Furthermore, "[b]ased on what [she] believes to be in Loretta's best interests, [Emma has] no wish to take advantage of any services which the Disability Law Center may be offering arising from the December 31, 1998 incident and do[es] not consent to allowing the Disability Law Center access to Loretta's records." (E. Riel Aff. ¶ 7.)

### III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  To prevail on summary judgment, the moving party

5

must show that there is an absence of evidence to support the non-moving party's position. Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To oppose summary judgment successfully, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc, 6 F.3d at 841 (quoting Anderson, 477 U.S. at 256). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

**B.   Statutory Scheme**

The Act mandates that to receive federal funding, every state "must have in effect a system to protect and advocate the rights of individuals with developmental disabilities." § 6042(a)(1). These state-appointed Protection and Advocacy

6

systems must "have the authority to -- (i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals with developmental disabilities.  42 U.S.C. § 6042(a)(2)(A)(i).  They also must have "the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  § 6042(a)(2)(B).  The P&A system must "be independent of any agency which provides treatment, services, or habilitation to individuals with developmental disabilities" and must "have access at reasonable times and locations to any resident" with a developmental disability in a facility. §§ 6042(a)(2)(G) and (H).

Of key significance to this suit, the P&A system must also: (I) have access to all records of

> (i) any individual with developmental disabilities who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
> (ii) any individual with development disabilities--

>> (I)   who, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;
>> (II)  who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

7

> > (III) with respect to whom a complaint has been
> > received by the system or with respect to
> > whom as a result of monitoring or other
> > activities there is probable cause to believe
> > that such individual has been subject to
> > abuse or neglect; and

> (iii) any individual with a developmental
> disability who has a legal guardian, conservator, or
> other legal representative with respect to whom a
> complaint has been received by the system or with
> respect to whom there is probable cause to believe the
> health or safety of the individual is in serious and
> immediate jeopardy whenever--

> > (I) such representatives have been contacted by
> > such system upon receipt of the name and
> > address of such representatives;

> > (II) such system has offered assistance to such
> > representatives to resolve the situation; and

> > (III) such representatives have failed or refused
> > to act on behalf of the individual.

§ 6042(a)(2)(I) (See also Appendix A for Pub. L. No. 106-402, 114

Stat 1677, 1715-16, § 143(a)(2)(I)(iii), the amended §

6042(a)(2)(I)(iii)).  The term "records" is defined to include,

among other things, "reports prepared by an agency or staff

person charged with investigating reports of incidents of abuse

or neglect, injury or death" that describe the incidents and the

steps taken to investigate the incidents.  42 U.S.C. § 6042(f).

## C.  The Role of the Guardian

The crux of this dispute is the interpretation of §

6042(a)(2)(I)(iii), giving the P&A access to "all" records, when

the P&A has received a complaint, or has probable cause,  with

respect to an individual with a legal guardian; the P&A has

8

contacted the guardian and offered assistance;[4] and the guardian has "failed or refused to act on behalf of the individual." § 6042(a)(2)(I)(iii).

The Commissioner asserts that this provision bars him from disclosing the records of a resident of a mental health facility against the wishes of a legal guardian who has made an informed decision to decline the P&A system's offer of services and assistance. He further contends that the phrase "failed or refused to act on behalf of the individual" is intended to address only those situations where an individual's appointed guardian has neglected her obligation as a guardian and failed to act in good faith. The DLC responds that it has statutory authority to obtain access to Loretta Riel's records without her guardian's consent even when the guardian acts in good faith, because it cannot fulfill its statutory mandate to investigate incidents of abuse and neglect, and to pursue appropriate legal remedies, without having access to the investigation reports and without reviewing the adequacy of the remedies provided.

The case law in this area is sparse. In <u>Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center</u>, 97 F.3d 492, 497 (11th Cir. 1996), interpreting 42 U.S.C.

---

[4] The Commissioner initially took the position that the DLC did not make an offer of assistance but just requested that the guardian sign a release form. However, the parties agreed at the hearing that any offer of assistance would be futile, because the guardian has chosen not to pursue the matter.

9

§ 6042(a)(2)(I)(ii), which governs residents who have no legal guardian, the Eleventh Circuit recognized that "the Act provides express authority for P&A's to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued." Id. (citing Miss. Prot. & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054, 1058-59 (5th Cir. 1991) ("The state cannot satisfy the requirements of [the Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.")).  Addressing the argument that the "families' unwillingness to release the records should be controlling," the court held, "Pursuant to § 6042, this contention is incorrect if [the residents] do not have a legal representative, including a legal guardian." Id.  Although the Eleventh Circuit seemed to suggest in dicta that a guardian has a statutory role in determining the access of a P&A to a resident's records in certain circumstances, it did not interpret the "failed or refused to act" language in § 6042(a)(2)(I)(iii)(III). Furthermore, the court insightfully observed,

> Since children living in institutions necessarily live away from their parents, the most involved and concerned parents cannot observe the majority of events experienced by their children in institutions. . . . Regular telephone calls or visits will not uncover abuse or neglect.  The opportunity to observe possible abuse or neglect is limited, particularly when institution staff offer plausible explanations for injuries. . . .

10

> [Parents'] faith in the institution does not
> alter the fact that abuse or neglect may have
> occurred.  Congress legislated the Act to
> protect disabled people who are unable to
> protect themselves.

Id. at 498 n.3.

Although no appellate court has interpreted §
6042(a)(2)(I)(iii)(III), two district courts have construed it
broadly.  One of these courts stated,

> It is evident from the structure of §
> 6042(a)(2)(I)(iii) that this section is
> designed to give P&A access to records where
> they have received a complaint and/or have
> probable cause regarding an individual, and
> the guardian has been contacted by the P&A
> and does not grant permission or refuses to
> act.  The language of this section of the Act
> is clear, and it contemplates access to
> records when the [P&A] either receives a
> complaint regarding an individual resident,
> or has probable cause to believe that the
> health or safety of an individual is in
> serious and immediate jeopardy.

Pennsylvania Prot. & Advocacy, Inc. v. Royer-Greaves Sch. for
Blind, 1999 WL 179797, at *8, *10 (E.D. Pa. 1999) (holding
further that "a guardian would not have the authority to deny
access to the records of an individual for whom this section is
satisfied, as this section is designed to give the P&A a right to
access in the event a guardian is not responsive or
cooperative."); Michigan Prot. & Advocacy Serv., Inc. v. Miller,
849 F. Supp. 1202, 1208 (W.D. Mich. 1994) (holding that the Act
does not require parental consent to access records and that the
Act "clearly mandate[s] that [P&A organizations] have the

11

authority to access . . . records in specific cases where developmentally disabled and mentally ill individuals are involved."); cf. West Virginia Advocates, Inc. v. Appalachian Cmty. Health Ctr., Inc., 191 W. Va. 671, 676, 447 S.E.2d 606, 611 (1994) (holding that federal law preempts state law and that "a disabled person has just as much authority to permit the [P&A] system to have access to his records as the legal guardian" under § 6042(a)(2)(G)(i)).

The Court's statutory construction of this difficult provision begins with the "oft-stated" canon that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." United States v. Holmquist, 36 F.3d 154, 160 (1st Cir. 1994) (quoting United States v. Ven Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985)). "[A] statute must be read as a whole, with due regard for its object, purposes, and underlying policy." Id.

Reading the statute as a whole, the Court is persuaded by the argument that where there is a complaint or probable cause, § 6042(a)(2)(I)(iii) gives the P&A the right to access those records necessary to "pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for" individuals with developmental disabilities and

12

"to investigate incidents of abuse and neglect of individual with developmental disabilities" even where the guardian does not give her consent.   §§ 6042(a)(2)(A)(i) & (a)(2)(B).   These complementary statutory duties to investigate and pursue legal remedies are not contingent on a guardian's consent.   Therefore, a construction of § 6042(a)(2)(I)(iii) permitting the guardian to block all access to records necessary to investigate an incident would effectively give the guardian veto power over the investigation itself, which would thwart the express statutory mandate of the P&A system.

The Commissioner argues that giving the P&A access to records regardless of the guardian's good faith objection would reduce to a useless formality the requirement that the P&A system contact the legal guardian and offer assistance.   If the P&A is allowed access to the individual's records regardless of how the legal guardian responds, the Commissioner asks, why not trigger the right to access simply upon the receipt of the complaint or the existence of probable cause?   This is a fair argument, because at the same time that the Act envisions an effective role for the P&A, it also respects the role of the legal guardian and the family.   The Act states, for example, that all programs, projects, and activities receiving financial assistance under the Act "shall be carried out in a manner consistent with the principles that--(3) individuals with developmental disabilities

13

and their families are the primary decisionmakers regarding the services and supports such individuals and their families receive . . . ." § 6000(c)(3). Further, the Act requires that the P&A should consult, work with, and provide assistance to, the guardian. Thus, rather than being a hollow gesture, the consulting requirement serves the salutory and hortatory purpose of encouraging the P&A and guardian to cooperate, and requiring the P&A to provide assistance to the guardian if requested.

However, the Act does not recognize guardians as the <u>sole</u> decision-makers. In fact, the Senate report from the 1990 amendments to the Act, which first incorporated language permitting P&A access to all records where a guardian "fail[s] or refuse[s] to act," indicates that the Act was not intended to grant a guardian power to block a P&A's access to an individual's records. It reads:

> Another issue raised was with regard to the difficulty experienced by some systems in reaching clients for whom the system has reason to believe that abuse or neglect may be occurring and that the health and safety of the individual is in serious jeopardy. In cases where the individual has a guardian, existing law requires that the P&A System not become involved if the guardian refuses the assistance offered. Clarification of the conditions under which the P&A System can intervene in these extraordinary circumstances is necessary.

S. Rep. No. 101-376, at 12 (1990). The Senate Report also pointed out that under then-current law, the P&A system could

gain access to records only for incompetent persons who did not have legal guardians. <u>Id.</u> at 23. It further explains:

> Section 13 amends Section 142 and clarifies the conditions under which protection and advocacy systems have access to records in those extraordinary situations when there is reason to believe that the health or safety of an individual with developmental disabilities is in serious or immediate jeopardy and the legal guardian, conservator, or other legal representatives have been in contact, offered assistance, but have failed or refused to act on behalf of the person.

<u>Id.</u> at 33. Thus, the legislative history supports the statutory interpretation that Congress intended to let the P&A's obligations trump the guardian's wishes in the "extraordinary circumstances" outlined in the statute.[5]

-------

[5] In stark contrast, prior to the 1990 Amendments to the Act, a guardian's ability to block a P&A's access to records was unbridled, because the statutory provision regarding access to records contained no qualifying language allowing a P&A to access records in certain circumstances, despite a guardian's refusal to grant permission. The relevant provision stated that a P&A must:

(G) have access to all records of --
    (i)   any person with developmental disabilities who is a client of the system if such person, or the legal guardian, conservator, or other legal representative of such person, has authorized the system to have such access; and
    (ii)  any person with developmental disabilities --
        (I)   who, by reason of the mental or physical condition of such person, is unable to authorize the system to have such access;
        (II)  who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
        (III) with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe that such person has

The Commissioner argues that the guardian here did not fail or refuse to act, but instead proactively investigated the incident and decided in good faith not to pursue further action based on what she believed to be in her ward's best interests. Essentially, the Commissioner urges the Court to read a subjective good faith component into the statute: that is, if the guardian refuses in good faith to act, the P&A is barred from access to the ward's records.  At first blush, this deferential approach is tempting, because it is consistent with state law dealing with guardianship, which provides that "[t]he guardian is responsible for the general care and control of [her] ward." Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of the Dep't of Mental Retardation,  424 Mass. 476, 478, 677 N.E.2d 156, 158 (1997) (citing Mass. Gen. Laws ch. 201, § 6A).  It is because primary responsibility for a ward's well-being lies with the legal guardian that "[c]ourts are reluctant to appoint a next friend when there is a duly appointed representative." Id. at 479, at 159.  "A next friend is not required where there is a duly appointed guardian, unless it is clear that the interests of the

----

been subject to abuse or neglect;".

Pub. L. No. 100-146, 101 Stat 840, ___, § 301(a)(2)(G) (amending 42 U.S.C. § 6042(a)(2)(G)).  Thus, the language that now exists in § 6042(a)(2)(I)(iii)(III) of the Act, permitting a P&A to access records if a guardian fails or refuses to act, simply did not exist until the 1990 statutory amendments.

guardian and the ward conflict."  Id.; accord Developmental
Disabilities Advocacy Ctr., Inc. v. Melton, 689 F.2d 281, 286
(1st Cir. 1982) (construing Fed. R. Civ. P. 17(c) as permitting
appointment of a next friend or guardian ad litem only when the
general representative has a conflict of interest).

However, the problem with the Commissioner's statutory
interpretation is that the rights of the P&A are governed by
federal law, not state law, and Congress did not limit the words
"failed or refused to act" with any modifier like "unreasonably,"
"in bad faith," or "in an abuse of trust."  In light of the
unambiguous mandate to the P&A to investigate incidents of abuse
and pursue appropriate remedies, the Court concludes that the
better interpretation of § 6042(a)(2)(I)(iii) is that the P&A is
entitled to obtain access to the records necessary for
investigation so long as the other statutory prerequisites are
met, regardless of the wishes of the guardian.

## IV. ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 15) is hereby **DENIED**.[6]  Plaintiff's Motion for Summary Judgment (Docket No. 13) is **ALLOWED**.  The defendant is ordered to release the investigation records to the DLC forthwith.

_____
PATTI B. SARIS
United States District Judge

---

[6] The DLC seeks discovery.  In light of this ruling, the request for discovery is denied.  Indeed, the request to depose the guardian highlights one of the flaws in a statutory interpretation which sets a good faith or abuse of trust standard, because discovery pits the guardian against the P&A system, although both seek the best interests of the resident.

18

## APPENDIX A

Sections 143(a)(1) & (2)(I)(iii) of the DD Act read in pertinent part:
SEC. 143. SYSTEM REQUIRED.

(a)   SYSTEM REQUIRED.--In order for a State to receive an
      allotment under subtitle B or this subtitle-
      (1)   the State shall have in effect a system to protect and
            advocate the rights of individuals with developmental
            disabilities;
      (2)   such system shall--
      ...

            (I)   have access to all records of--
      ...

                  (iii)  any individual with a developmental
                         disability, in a situation in which--
                         (I)    the individual has a legal guardian,
                                conservator, or other legal
                                representative;
                         (II)   a complaint has been received by the
                                system about the individual with regard
                                to the status or treatment of the
                                individual or, as a result of monitoring
                                or other activities, there is probable
                                cause to believe that such individual
                                has been subject to abuse or neglect;
                         (III)  such representative has been contacted
                                by such system, upon receipt of the name
                                and address of such representative;
                         (IV)   such system has offered assistance to
                                such representative to resolve the
                                situation; and
                         (V)    such representative has failed or
                                refused to act on behalf of the
                                individual.

19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                           \*

NSA INVESTMENTS II LLC,         \*

      Plaintiff,          \*

                          \*

     v.                      \*

SERANOVA, INC., INTELLIGROUP, INC.,  \*
RAJKUMAR KONERU
and RAVI SINGH,               \*

                          \*

      Defendants,        \*

      and                  \*

                          \*

SILVERLINE TECHNOLOGIES, LTD.,   \*

      Reach and Apply Defendant.  \*

                          \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CIVIL ACTION
NO.

01 10223 PBS

*(handwritten)* 28568

AM \$150.00
SUMM ISSUED — yes
LOCAL RULE 4.1 —
WAIVER OF SERV. —
MCF ISSUED —
AO 120 OR 121 —
BY DPTY CLK H.I.
DATE 2/7/01

## COMPLAINT AND JURY DEMAND

### Introduction

1.      Plaintiff NSA Investments II LLC ("NSA") invested \$4.0 Million in defendant SeraNova, Inc. ("SeraNova") in March 2000 as part of a private placement of SeraNova stock. NSA and SeraNova agreed that the purpose of the investment was to facilitate the spin-off of SeraNova from its parent company, Intelligroup, Inc. ("Intelligroup"). At the time of its investment, NSA received oral representations, warranties, and assurances from defendants SeraNova, Rajkumar Koneru ("Koneru") and Ravi Singh ("Singh") with respect to, among other things, the following four issues: (1) that SeraNova would be spun-off from its parent company and become a separate, publicly-traded entity within days of the NSA investment; (2) that

**DOCKETED**



SeraNova's assets had been released as collateral for a loan to SeraNova's parent company and that SeraNova had secured its own bank financing; (3) that SeraNova could access $5.0 Million in investment funds from an existing investor at the option of SeraNova; and (4) that defendants Koneru and Singh would devote their full time and efforts to the business of SeraNova and not to competing, personal ventures which they had been pursuing. NSA specifically advised SeraNova that these issues were critical to NSA's evaluation of its participation in the SeraNova private placement. These assurances were given by Koneru and Singh both in their capacities as officers and directors of SeraNova and in their individual capacities as investors in SeraNova and Intelligroup. These representations were repeated in a written Stock Purchase Agreement entered into between NSA and SeraNova on March 14, 2000 ("Stock Purchase Agreement"). As detailed more fully below, each of these representations was false, and known to be false, when made.

2.      NSA invested in SeraNova in March 2000 solely to facilitate the planned spin-off. Had NSA known that any one of the factual representations was untrue, NSA would not have agreed to invest $4.0 Million in the SeraNova private placement in March 2000, would not have entered into the Stock Purchase Agreement, and would not have wired its $4.0 Million investment to SeraNova on March 27, 2000. NSA seeks to recover its full investment in return for the stock received in the private placement and to recover all damages arising out of the negligent misrepresentations, fraudulent misrepresentations, securities laws violations, breaches of contract, breaches of the implied covenant of good faith and fair dealing, and unfair or deceptive acts or practices by SeraNova, Koneru and Singh.

### The Parties

3.      NSA is a Massachusetts limited liability company with its principal place of business in Norwood, Massachusetts. NSA is a private investment fund.

2

4.     Defendant SeraNova is a publicly-traded New Jersey corporation with its principal place of business in Edison, New Jersey and a location in Newton, Massachusetts. SeraNova provides Internet services to businesses, such as designing and implementing Internet-based software applications that assist companies to manage procurement, sell products and services, provide customer service, conduct supplier transactions and communicate with employees over the Internet.  SeraNova was spun-off from its then-parent company, Intelligroup, in July 2000.

5.     Defendant Koneru is an individual residing at 10 Chamonix Lane, Morganville, New Jersey.  Koneru is Chairman, Chief Executive Officer, President and a major shareholder of SeraNova.  He has been the CEO of SeraNova since the company's formation as a subsidiary of Intelligroup in September, 1999.  Koneru served as Chief Executive Officer of Intelligroup from November 1997 to April 1998 and from May 1999 to January 2000, and as a director during at least part of these periods.  Koneru is also a major shareholder of Intelligroup.  He directed the reorganization of Intelligroup, resulting in the decision to spin off the Internet services unit as SeraNova.  Koneru is also a co-founder and the Chairman of the Board of Directors of IndiaInfo.Com Ltd. ("IndiaInfo"), an Internet portal that delivers India-related content, community and commerce to Indian consumers and businesses, and provides e-business consulting in direct competition with SeraNova.  Koneru is also the founder and Chairman of ClearMist -- incorporated in the United States as ClearMist, Inc. and in India as ClearMist Technologies Ltd. -- a company that builds, supports and optimizes Internet-based solutions and enterprise applications in direct competition with SeraNova.

3

6.      Defendant Singh is an individual residing in New Jersey. Singh is the Chief Financial Officer, Executive Vice President and Director of SeraNova. He joined SeraNova in September 1999 as Executive Vice President for Corporate Development and Chief Financial Officer, and guided the company through its spin-off from Intelligroup. Singh is also a director of IndiaInfo.

7.      Intelligroup is a publicly-traded New Jersey corporation with its principal place of business in Edison, New Jersey. Intelligroup is a global Application Service Provider (ASP) that designs, builds and supports Internet solutions and enterprise applications. Prior to the March, 2000 private placement, Intelligroup owned 100% of the stock of SeraNova. At all times material to NSA's claims, Intelligroup was a controlling person of SeraNova for purposes of the securities laws.

8.      Reach and apply defendant Silverline Technologies Ltd. ("Silverline") is a publicly-traded company based in India with a place of business in Piscataway, New Jersey and a location in Milton, Massachusetts. Silverline is a global information-technology services provider with operations based both in India and the United States. On October 27, 2000, Silverline and SeraNova announced their agreement to merge in a stock-for-stock deal (described more fully below) pursuant to which shareholders of SeraNova such as Koneru and Singh are to receive .35 shares of Silverline stock in exchange for each share of SeraNova stock.

## Jurisdiction and Venue

9.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because it arises, in part, under the federal securities laws, and pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states.

4

10.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391.

## Facts

### *The History of the SeraNova Spin-Off*

11.     SeraNova was originally a wholly-owned subsidiary of Intelligroup.  On

September 9, 1999, Intelligroup formed Infinient Inc. as a subsidiary.  On December 6, 1999,

Infinient Inc. changed its name to SeraNova.  On December 13, 1999, Intelligroup issued a press

release stating that it intended to spin off SeraNova and that the spin-off was "expected to be

completed by the end of first quarter of 2000," i.e., by the end of March 2000.

12.     The practical effect of the SeraNova spin-off was that shareholders of Intelligroup

would receive one share of SeraNova stock for every share of Intelligroup stock owned.  In other

words, an Intelligroup shareholder owning 1,000 Intelligroup shares before the spin-off would

own 1,000 Intelligroup shares and 1,000 SeraNova shares after the spin-off.  Because NSA

owned a significant amount of Intelligroup stock in early 2000, NSA wanted the spin-off to

occur.  NSA was willing to invest $4.0 Million in the SeraNova private placement because the

spin-off would have resulted in NSA owning Intelligroup and SeraNova stock valued well in

excess of $4.0 Million.  In other words, provided the spin-off occurred promptly, NSA would

immediately realize a significant benefit from the SeraNova investment.  On the other hand,

without assurances that the spin-off would occur promptly, NSA would not have invested

$4.0 Million in the private placement because by itself that investment was completely illiquid

(i.e., NSA received restricted shares which could not be traded by NSA), and offered no near-

term advantage to offset the loss of use of those funds.

13.     In preparation for its contemplated spin-off from Intelligroup, on January 27,

2000 SeraNova filed with the United States Securities and Exchange Commission ("SEC") a

Form 10 Registration Statement, the General Form for Registration of Securities. The

Information Statement accompanying the Form 10 announced the proposed spin-off of all

outstanding shares of SeraNova, then held by Intelligroup, to Intelligroup shareholders. The

Information Statement also announced SeraNova's intention to have its common stock approved

for quotation on the NASDAQ National Market, and its expectation that a market would develop

on or shortly before the record date for the spin-off and that regular trading would begin on the

first business day after the effective date of the spin-off.

### The March 2000 Private Placement

14.     Also in anticipation of its spin-off from Intelligroup, in March 2000 SeraNova

conducted a private placement offering whereby investors including NSA agreed to purchase

SeraNova shares for $10 million. Of that amount, NSA invested $4.0 million. SeraNova's stated

purpose in conducting the private placement was to facilitate and indeed to accelerate the spin-

off. To induce NSA's investment, the defendants made at least four material misrepresentations.

15.     First, defendants misrepresented the timing of SeraNova's spin-off from

Intelligroup. NSA made clear to defendants prior to and at the time of the March private

placement that the timing of the Sera-Nova spin-off was critical to NSA's investment decision.

NSA was assured by both Koneru and Singh, acting as officers and directors of SeraNova, that if

NSA made its investment, the spin-off would be approved by the Securities Exchange

Commission ("SEC") and would occur immediately. Most specifically, on March 14, 2000, in

the afternoon, Singh telephoned NSA and told NSA that the only remaining hurdle to

accomplishing the spin-off was to increase SeraNova's capital through the private placement and

that the spin-off would be completed by the end of March 2000.

6

16.     Defendants SeraNova, Koneru and Singh made similar representations even after they had induced NSA to enter into the Stock Purchase Agreement.  On or about March 21, Dokeniya and Palakurthi met with Koneru in person, at which time Koneru informed them that the spin-off was "on schedule."  Later, in a telephone conversation immediately preceding the March 27, 2000 closing of the private placement, Singh told NSA that the spin-off would occur as soon as SeraNova received NSA's investment funds on March 27.

17.     At the time these representations were made, SeraNova, Koneru and Singh knew or should have known that the spin-off would not occur immediately upon the closing of the private placement or even shortly thereafter.  At a minimum SeraNova, Koneru and Singh knew or should have known that the Form 10 then on file with the SEC was not the appropriate documentation to accomplish the spin-off.  In fact, SeraNova withdrew the Form 10 on or about March 24, 2000 in a clear acknowledgment that the then pending Form 10 was inappropriate to accomplish the spin-off.

18.     Defendants also misrepresented the status of SeraNova's financing in response to direct questions from NSA.  At the time of the private placement, SeraNova's corporate parent, Intelligroup, had a line of credit with PNC Bank.  The line of credit was collateralized by, among other things, the assets of SeraNova.  Prior to making its private placement investment, NSA directly asked Singh whether the PNC release had been obtained.  Singh assured NSA that it had been.  In particular, during a telephone conversation on the afternoon of March 14, 2000, Singh told NSA that PNC Bank had agreed to release the SeraNova assets.  That statement was false -- PNC had not released (or agreed to release) the SeraNova assets as collateral for the Intelligroup loan at or about the time of the March 2000 private placement.  Indeed, appropriate releases were not obtained until May 31, 2000.  In addition, Singh represented to NSA during the same

7

telephone conversation that SeraNova had secured its own bank financing. That statement was false -- in response to later questioning by NSA, SeraNova explained that the spin-off had been delayed due, in part, to its lack of bank financing. In response to NSA's inquiries, Koneru repeated these false statements concerning the release of assets and the arrangement of SeraNova's bank financing in a face to face meeting with NSA on March 21, 2000 at SeraNova's offices in New Jersey.

19.     Defendants also misrepresented the existence of an option to secure an additional $5.0 Million investment in SeraNova. In particular, during a telephone conversation on March 14, 2000, in connection with negotiating the Stock Purchase Agreement, Singh told NSA that one of the investors in the private placement had agreed to give SeraNova a "put" option to sell another $5 Million of the same securities to that investor at SeraNova's option. Defendants' misrepresentation concerning the option was intended to bolster SeraNova's apparent financial strength. In fact, the statement was false -- upon information and belief, the option either never existed or SeraNova never intended to exercise it. NSA's belief is based upon several facts, including: (a) Sera Nova needed capital after March, 2000 yet never exercised its option; (b) SeraNova later (in September, 2000) conducted a further private placement on less advantageous terms without first exercising the purported option; (c) in response to NSA's inquiries about the purported option, SeraNova has responded only that the alleged option "expired" and has never provided NSA with a copy of the purported "Option Letter" or any other evidence of the existence of the option; and (d) if the option was of limited duration, SeraNova never disclosed that fact in any of its public filings.

20.     Finally, defendants misrepresented the amount of time and effort that Koneru and Singh would be devoting to the business of SeraNova. NSA considered Koneru's and Singh's

8

commitment to SeraNova to be critical to the success of the company, and NSA was therefore concerned that Koneru and Singh were devoting too much of their time to developing the business of IndiaInfo at the expense of SeraNova. NSA confronted Koneru and Singh with these concerns prior to the private placement. NSA was assured that Koneru and Singh intended to and would devote substantially all of their time, energy, and attention to achieving the spin-off and to the business of SeraNova. In particular, on several occasions during January to March 2000, including at the face-to-face meeting between Koneru and NSA in New Jersey in early March, 2000, Koneru told NSA that he intended to and would devote his full time to SeraNova and that he would make sure that other SeraNova employees who were involved with IndiaInfo would also devote their complete attention to SeraNova. Those representations were false when made -- both before and after the private placement, Koneru and Singh intended to and did direct substantial time, energy, and attention to IndiaInfo at the expense of SeraNova and to the detriment of SeraNova's shareholders. A third SeraNova employee, Tarun Chandra, likewise has directed time, energy, and attention to IndiaInfo at the expense of SeraNova. In addition, most recently, Koneru has founded yet another Internet services company, ClearMist, with the help of two other employees of IndiaInfo. ClearMist is in direct competition with SeraNova, and Koneru continues to act in his own interests and contrary to the interests of SeraNova and its investors. This activity demonstrates that, at the time they made contrary representations to NSA, neither Koneru nor Singh intended to devote their full time and attention to SeraNova.

**The Stock Purchase Agreement**

21.     As part of the private placement, SeraNova and NSA entered into the Stock Purchase Agreement dated March 14, 2000. On that day, drafts of the Stock Purchase Agreement were exchanged by facsimile transmission between NSA in Massachusetts and the

defendants in New Jersey. As set forth below, the Stock Purchase Agreement memorialized and repeated, as express representations and warranties of SeraNova, the oral misrepresentations that had been made to induce NSA's $4.0 Million investment. The Stock Purchase Agreement required each representation and warranty of SeraNova to be true when made, on March 14, 2000, and when the private placement closed on March 27, 2000. As described below, several of these representations and warranties were not true on March 14, 2000 or when the transaction closed on March 27, 2000.

22.     First, with respect to the timing of SeraNova's spin-off from Intelligroup, SeraNova represented and warranted in § 2.13 of the Stock Purchase Agreement that, as of the date filed, the Form 10 SeraNova filed with the SEC on January 27, 2000 complied in all material respects with the requirements of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended, and the applicable rules and regulations of the SEC promulgated thereunder. This representation was false when made, as evidenced by SeraNova's withdrawal of the Form 10 on March 24, 2000, only ten days after execution of the Stock Purchase Agreement and only three days before the closing.

23.     Second, with respect to the status of SeraNova's financing, SeraNova represented and warranted in § 2.12 of the Stock Purchase Agreement that it owned its property and assets free and clear of all mortgages, liens, loans and encumbrances that would materially impair its ownership or use of such property or assets. Contrary to this representation, and contrary to similar representations made by Koneru and Singh, SeraNova had not received the releases from Intelligroup's lenders -- including PNC Bank, which held a lien on, and thereby materially impaired, all of SeraNova's assets -- which were necessary to make these representations true.

10

24.     Third, with respect to the $5.0 Million investment option, SeraNova represented and warranted in § 2.2 of the Stock Purchase Agreement that it had an arrangement with EvansVille Limited, documented in an Option Letter, whereby, at SeraNova's sole option, EvansVille Limited would purchase a fixed number of shares of SeraNova common stock at the same price and on the same terms and conditions as set forth in the Stock Purchase Agreement. Upon information and belief, as explained above, no such option existed or SeraNova never intended to exercise any such option.

25.     Fourth, the Stock Purchase Agreement memorialized defendants' promise that Koneru and Singh would devote substantially all of their time, energy, and attention to SeraNova.  In particular, SeraNova represented and warranted in § 2.10 of the Stock Purchase Agreement that the disclosures made in its January 27, 2000 Form 10 were true.  Incorporated as exhibits to the Form 10 were written employment agreements with Koneru and Singh.  In his employment agreement, Koneru represented and agreed that he would devote his full working time, energy and skill to the business of SeraNova, and would not serve as a member of the board of directors of another company or organization if such service would interfere with the performance of his duties to SeraNova.  Similarly, in his employment agreement, Singh represented and agreed that he would devote his full business time and attention to the faithful and diligent performance of his duties to SeraNova, and would not engage in activities that would materially interfere with the performance of his duties to SeraNova or which, even if non-interfering, may be contrary to SeraNova's interests.  Yet, at the time the Stock Purchase Agreement was executed, Koneru and Singh were directing substantial time, energy and attention to IndiaInfo at the expense of SeraNova and intended to continue to do so.

11

***Continued Spin-Off Delays***

26.     The private placement investment pursuant to the Stock Purchase Agreement

closed on March 27, 2000.  On that day, NSA wired its $4.0 Million investment to SeraNova.

Before closing the deal and wiring the money, NSA on or about March 27, 2000 requested and

received further assurances that the spin-off was imminent.  In particular, in response to NSA's

concerns about SeraNova's withdrawal of the Form 10 on March 24, 2000, Singh and Ashok

Roy ("Roy"), SeraNova's Vice President for Business Development, told NSA that the

withdrawal was "no big deal" and was done merely to avoid expiration of the form.  They also

told NSA that SeraNova needed to make only a very minor change to the Form 10 and would

then "refile" it.  Finally, they told NSA that they were very confident that the spin-off would take

place within a week or at most ten days.  These further assurances again were false, as SeraNova

knew or should have known at the time.  SeraNova did not even file the appropriate spin-off

documentation until April 18, 2000.  That documentation, a Form S-1 required by the SEC,

remained subject to SEC approval.  In addition, the required releases relating to SeraNova's

assets had not yet been obtained.  Therefore, SeraNova could not have believed in good faith that

the spin-off was imminent.

27.     In fact, the spin-off of SeraNova did not occur until July 5, 2000, a nearly four-

month delay from the time NSA and SeraNova entered into the Stock Purchase Agreement.  The

delays were directly attributable to the concerns expressed by NSA, about which SeraNova

misrepresented the facts.  For example, one reason for the delay of the spin-off was defendants'

failure to secure release of SeraNova's assets as collateral for the PNC Bank loan to Intelligroup.

That release was not obtained until May 31, 2000.  Another  reason for the delay of the spin-off

was the unavailability and consequent lack of managerial direction of Koneru and Singh, who spent considerable time and directed substantial energies to other pursuits, including IndiaInfo.

28.     NSA believed that its private placement investment was simply a means to an end, i.e., accomplishing the SeraNova spin-off within a matter of days.  As a result, NSA specifically sought assurances from defendants that the SeraNova spin-off would occur immediately after the March 2000 private placement.  Defendants represented to NSA that NSA's $4.0 Million investment would facilitate the immediate spin-off of SeraNova.  NSA would not have invested $4.0 Million in the March private placement had defendants not made these representations.

29.     NSA's reliance upon defendants' representations was reasonable because, in part, the representations were consistent with other representations made to NSA.  For example, during a face-to-face meeting in New Jersey on March 4 or 5, 2000, Koneru had told NSA that the spin-off was to be completed within a few week's time, that PNC Bank would soon release SeraNova's assets as collateral for the loan to Intelligroup, and that he intended to and would devote his full time to the business of SeraNova and make sure that other SeraNova employees who were involved with IndiaInfo would also devote their complete attention to SeraNova.  Later, on or about March 21, Dokeniya and Palakurthi met with Koneru in person, at which time Koneru informed them that the spin-off was "on schedule."

*The Silverline Merger Transaction*

30.     On October 27, 2000 Silverline and SeraNova announced a merger transaction pursuant to which shareholders of SeraNova will receive .35 shares of Silverline for each share of SeraNova.  As of the announcement date, the value of the deal to SeraNova stockholders in a per share basis was approximately $5.00 per share.  Just weeks prior to the announcement,

Koneru had assured NSA, in response to NSA's concerns about Koneru's myriad conflicts of interest relating to Intelligroup, SeraNova, and IndiaInfo, that he would not consider a transaction for SeraNova at less than $12.00 per share.

31.     Upon information and belief, Koneru is pursuing the Silverline merger out of purely personal motives relating to his desire to cash out of SeraNova and pursue competing business interests. For example, as the trading prices of Intelligroup and SeraNova stock fell during the August through October 2000 time period, Koneru faced significant margin calls requiring him to raise substantial funds and/or lose substantial portions of his stock holdings. Because Koneru had already shifted his loyalties and efforts away from SeraNova and toward IndiaInfo and other competing ventures, resurrecting SeraNova and its stock price would have involved a complete reversal of his strategies and efforts. Finding a buyer (i.e., merger partner) like Silverline was an easier, faster exit strategy for Koneru.

32.     According to SeraNova's and Silverline's SEC filings, a special meeting of SeraNova shareholders will take place on February 12, 2001 for the purpose of approving the Silverline merger. NSA expects that the merger will close immediately after the SeraNova shareholder vote. As part of the merger, both Koneru and Singh will receive Silverline stock in exchange for their SeraNova stock including stock options which immediately vest upon the closing of the merger. In the case of Koneru, who beneficially owns over 2,000,000 shares of SeraNova stock and almost 800,000 stock options, the exchange for Silverline stock will be substantial and will, upon information and belief, constitute the primary if not sole source of any recovery by NSA against Koneru. NSA believes that unless Koneru's and Singh's shares in SeraNova (pre-merger) or Silverline (post-merger) are held in escrow, NSA will not be able to recover on any judgment it receives against Koneru and/or Singh. To avoid any impact on the

14

merger itself, NSA seeks only to restrict the post-merger shares which Koneru and Singh would otherwise hold, and in no way seeks to impair SeraNova's and Silverline's ability to merge as anticipated.

## COUNT I - NEGLIGENT MISREPRESENTATION
### (As to SeraNova, Koneru and Singh)

33.    NSA restates and incorporates each of the allegations contained in paragraphs 1 - 32.

34.    Defendants, in the course of business, made false or misleading statements of material fact to plaintiff for the guidance of plaintiff with respect to a business transaction, the March 2000 private placement.

35.    Defendants failed to exercise reasonable care in making the false or misleading statements to plaintiff.

36.    Plaintiff justifiably relied on defendants' false or misleading statements of material fact.

37.    Defendants' failure to exercise reasonable care in making the false or misleading statements to plaintiff has caused plaintiff to suffer pecuniary loss.

## COUNT II - FRAUDULENT MISREPRESENTATION
### (As to SeraNova, Koneru and Singh)

38.    NSA restates and incorporates each of the allegations contained in paragraphs 1 - 37.

39.    Defendants made statements of material fact to plaintiff which defendants knew to be false or misleading when made.

40.    Defendants intended by their false or misleading statements of material fact to induce plaintiff to invest in SeraNova in March 2000.

15

41.     Plaintiff reasonably relied upon defendants' false or misleading statements of material fact when it entered into the Stock Purchase Agreement and wired $4 Million to SeraNova, which, but for defendants' misrepresentations, plaintiff would not have done.

42.     Defendants' misrepresentations caused plaintiff to suffer loss.

### COUNT III - SECURITIES LAWS VIOLATIONS
### (As to Intelligroup, SeraNova, Koneru and Singh)

43.     NSA restates and incorporates each of the allegations contained in paragraphs 1 - 42.

44.     Each of the defendants made false or misleading statements of material fact concerning the timing of the spin-off of SeraNova, the release of SeraNova's assets as collateral for a loan to Intelligroup and the availability of bank financing, the availability of an optional $5.0 Million in additional investment, and the amount of time and attention that Koneru and Singh would devote to SeraNova.

45.     In making each of their false or misleading statements of material fact, defendants employed a means or instrumentality of interstate commerce.

46.     Each of defendants' false or misleading statements of material fact were made with intent to deceive, manipulate, or defraud, or were made with recklessness as to their falsity or materially misleading nature.

47.     Each of defendants' false or misleading statements of material fact were made in connection with the purchase or sale of securities and in violation of, among other securities laws provisions, Sections 10(b), 17(a) and 20(a) of the Securities Exchange Act of 1934.

48.     Plaintiff reasonably relied upon defendants' false or misleading statements, and that reliance proximately caused injury to plaintiff.

16

49.     Koneru and Singh each is a "controlling person" vis-a-vis SeraNova and each is, pursuant to Section 20(a) of the Securities Exchange Act of 1934, jointly and severally liable with and to the same extent as SeraNova for the false or misleading statements that SeraNova made.

50.     Intelligroup was a "controlling person" vis-a-vis SeraNova at all times relevant to NSA's claims and is, pursuant to Section 20(a) of the Securities Exchange Act of 1934, jointly and severally liable with and to the same extent as SeraNova for the false or misleading statements that SeraNova made.

### COUNT IV - BREACH OF CONTRACT
### (As to SeraNova)

51.     NSA restates and incorporates each of the allegations contained in paragraphs 1 - 50.

52.     The Stock Purchase Agreement is a valid and enforceable agreement between plaintiff and SeraNova and is supported by valid consideration.

53.     NSA has fully performed its obligations owed pursuant to the Stock Purchase Agreement.

54.     SeraNova materially breached the Stock Purchase Agreement by violating representations and warranties set forth therein.

55.     SeraNova's breach of the Stock Purchase Agreement has caused plaintiff to suffer loss.

## COUNT V - BREACH OF IMPLIED COVENANT OF GOOD FAITH
### (As to SeraNova)

56.    NSA restates and incorporates each of the allegations contained in paragraphs 1 - 55.

57.    The Stock Purchase Agreement is a valid and enforceable agreement between plaintiff and SeraNova.

58.    By entering into the Stock Purchase Agreement with plaintiff, SeraNova impliedly covenanted to act in good faith toward plaintiff.

59.    SeraNova breach its implied covenant of good faith by violating representations and warranties set forth in the Stock Purchase Agreement and by otherwise pursuing a course of conduct the effect of which was to defeat the reasonable expectations of NSA with respect to the parties' contractual relationship.

## COUNT VI - VIOLATION OF M.G.L. c. 93A
### (As to SeraNova)

60.    NSA restates and incorporates each of the allegations contained in paragraphs 1 - 59.

61.    SeraNova made statements of material fact to plaintiff, which SeraNova knew to be false or misleading when made, in order to induce plaintiff to invest in SeraNova in March 2000.

62.    SeraNova's false or misleading statements of material fact influenced plaintiff's decision to enter into and close the Stock Purchase Agreement.

18

63.     By making false or misleading statements of material fact in order to induce plaintiff to invest in SeraNova in March 2000, SeraNova engaged in unfair or deceptive acts or practices.

64.     SeraNova's unfair or deceptive acts or practices, and the harm resulting therefrom, occurred primarily and substantially within Massachusetts.

65.     SeraNova's unfair or deceptive business practices caused plaintiff to suffer loss of money or property.

## COUNT VII - REACH AND APPLY
### (As to Silverline)

66.     NSA restates and incorporates each of the allegations contained in paragraphs 1 - 65.

67.     Reach and Apply defendant Silverline holds or will hold property, right, title or interest of Koneru and Singh which may be reached and applied to the debts that Koneru and Singh owe NSA.

68.     Reach and Apply defendant Silverline and is agents, servants, employees, assigns, attorneys and other representatives, and anyone acting by, through, or on behalf of Silverline, should be restrained and enjoined from alienating, encumbering, concealing, transferring, conveying, selling, mortgaging, pledging, hypothecating, dissipating, or in any way disposing of any property, right, title or interest of Koneru or Singh in corporate shares of Silverline, and such shares should be reached and applied to the satisfaction of any judgment against Koneru and Singh entered in this action.

WHEREFORE, NSA seeks the following relief:

a.      a preliminary injunction against Reach-and-Apply Defendant Silverline and against Koneru and Singh ordering Silverline, Koneru and Singh to place in escrow with the Court or as otherwise ordered, Koneru's and Singh's respective shares of Silverline receivable by Koneru and Singh pursuant to the Silverline/SeraNova merger.

B.      Damages under Counts I - VI.

C.      Multiple damages and attorneys' fees under Count VI.

D.      Such other and further relief as the Count deems appropriate.

### JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all counts so triable.

NSA INVESTMENTS II LLC

By its attorneys,

_____
Mark E. Tully (BBO No. 550403)
Greer N. Shaw (BBO No. 638128)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

DATED: February 7, 2001

1032149.4 liba

20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAW'S SUPERMARKETS, INC.,          )
    Plaintiff,                     )
                                   )
                                   )
v.                                  )          Civil Action No: 00CV11571 WGY
                                   )
CASH TECHNOLOGIES, INC. AND         )
COIN BANK AUTOMATED SYSTEMS,        )
INC.,                               )
    Defendants.                    )
                                   )

### ANSWER & JURY DEMAND

    The Defendants, Cash Technologies, Inc. and Coin Bank
Automated Systems, Inc., hereby respond to the Plaintiff's
Complaint as follows:

### The Parties

    1.   The Defendants are without sufficient information to
admit or deny the allegations contained in this paragraph and
therefore deny the same.

    2.   Admitted.

    3.   Admitted.

### Jurisdiction and Venue

    4.   This paragraph contains a conclusion of law which
requires no response.

    5.   This paragraph contains a conclusion of law which
requires no response.





6.    This paragraph contains a conclusion of law which requires no response.

## Facts

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    The Defendants deny the allegations contained in this paragraph.

14.    The Defendants deny the allegations contained in this paragraph.

15.    The Defendants deny that they defaulted on the agreement.

16.    The Defendants deny that they defaulted on the agreement.

17.    Admitted.

18.    Admitted.

19.    The Defendants deny the allegations contained in this paragraph.

20.    Cash Technologies denies that it is responsible for Coin Bank's obligations.

21.   Admitted.

22.   The Defendants state that the agreement speaks for itself.

23.   The Defendants state that the agreement speaks for itself.

24.   The Defendants deny that they defaulted on the agreement.

25.   The Defendants deny that they defaulted on the agreement.

26.   The Defendants deny that they defaulted on the agreement.

27.   The Defendants deny that they defaulted on the agreement.

28.   The Defendants deny that they defaulted on the agreement.

29.   The Defendants deny the allegations contained in this paragraph.


## COUNT I

### Breach of Contract Against CoinBank

30.   The Defendants reincorporate and reallege their responses to paragraphs 1 through 29.

31.   The Defendants deny the allegations contained in this paragraph.

-3-

32.  The Defendants deny the allegations contained in this paragraph.

33.  The Defendants deny the allegations contained in this paragraph.

34.  The Defendants deny the allegations contained in this paragraph.

**COUNT II**

**Breach of Contract Against Cash Technologies**

35.  The Defendants reincorporate and reallege their responses to paragraphs 1 through 34.

36.  The Defendants deny the allegations contained in this paragraph.

37.  The Defendants deny the allegations contained in this paragraph.

38.  The Defendants deny the allegations contained in this paragraph.

39.  The Defendants deny the allegations contained in this paragraph.

40.  The Defendants deny the allegations contained in this paragraph.

41.  The Defendants deny the allegations contained in this paragraph.

42.  The Defendants deny the allegations contained in this

paragraph.

## Prayers For Relief

The remainder of the complaint contains a Prayer for Relief which requires no response.  To the extent that the Request for Relief sets forth allegations that require a responsive pleading those allegations are denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Plaintiff's complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The Plaintiff's claims are barred by the applicable statute of limitations.

### Third Affirmative Defense

The Plaintiff's claims are barred by laches or estoppel.

### Fourth Affirmative Defense

The Plaintiff's claims are barred by the doctrine of unclean hands.

### Fifth Affirmative Defense

The Plaintiff failed to mitigate its damages.

### Sixth Affirmative Defense

The Plaintiff has waived any right to assert the claims

alleged in its complaint.

WHEREFORE, the Defendants request that this Court:

1.   Dismiss with prejudice the Plaintiff's complaint;

2.   Award the Defendants interest, costs and attorney's fees; and

3.   Award the Defendants such other and further relief as this Court deems just and appropriate.

**DEFENDANTS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

CASH TECHNOLOGIES, INC. AND
COIN BANK AUTOMATED SYSTEMS, INC.,
by their attorneys,

*Paul F. Beckwith*

Paul F. Beckwith, BBO #:   550186
Kenneth J. Martin, BBO #:   636643
COOLEY MANION JONES LLP
21 Custom House St.
Boston, MA 02110
(617) 737-3100

and

Brian C. Daughney, Esq.
GOLDSTEIN & DiGIOIA, LLP
369 Lexington Avenue - 18th Floor
New York, NY 10017
(212) 599-3322

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on *10/23/2000*
*Paul F. Beckwith*

Dated: *10/23/2000*

50109

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAW'S SUPERMARKETS, INC., )
    Plaintiff, )
     )
     )
v. )   Civil Action No: 00CV11571 WGY
     )
CASH TECHNOLOGIES, INC. AND )
COIN BANK AUTOMATED SYSTEMS, )
INC., )
    Defendants. )
     )

### ANSWER & JURY DEMAND

The Defendants, Cash Technologies, Inc. and Coin Bank Automated Systems, Inc., hereby respond to the Plaintiff's Complaint as follows:

### The Parties

1.    The Defendants are without sufficient information to admit or deny the allegations contained in this paragraph and therefore deny the same.

2.    Admitted.

3.    Admitted.

### Jurisdiction and Venue

4.    This paragraph contains a conclusion of law which requires no response.

5.    This paragraph contains a conclusion of law which requires no response.



6.   This paragraph contains a conclusion of law which requires no response.

### Facts

7.   Admitted.

8.   Admitted.

9.   Admitted.

10.   Admitted.

11.   Admitted.

12.   Admitted.

13.   The Defendants deny the allegations contained in this paragraph.

14.   The Defendants deny the allegations contained in this paragraph.

15.   The Defendants deny that they defaulted on the agreement.

16.   The Defendants deny that they defaulted on the agreement.

17.   Admitted.

18.   Admitted.

19.   The Defendants deny the allegations contained in this paragraph.

20.   Cash Technologies denies that it is responsible for Coin Bank's obligations.

-2-

21.  Admitted.

22.  The Defendants state that the agreement speaks for itself.

23.  The Defendants state that the agreement speaks for itself.

24.  The Defendants deny that they defaulted on the agreement.

25.  The Defendants deny that they defaulted on the agreement.

26.  The Defendants deny that they defaulted on the agreement.

27.  The Defendants deny that they defaulted on the agreement.

28.  The Defendants deny that they defaulted on the agreement.

29.  The Defendants deny the allegations contained in this paragraph.


## COUNT I

### Breach of Contract Against CoinBank

30.  The Defendants reincorporate and reallege their responses to paragraphs 1 through 29.

31.  The Defendants deny the allegations contained in this paragraph.

32.  The Defendants deny the allegations contained in this paragraph.

33.  The Defendants deny the allegations contained in this paragraph.

34.  The Defendants deny the allegations contained in this paragraph.


## COUNT II

### Breach of Contract Against Cash Technologies

35.  The Defendants reincorporate and reallege their responses to paragraphs 1 through 34.

36.  The Defendants deny the allegations contained in this paragraph.

37.  The Defendants deny the allegations contained in this paragraph.

38.  The Defendants deny the allegations contained in this paragraph.

39.  The Defendants deny the allegations contained in this paragraph.

40.  The Defendants deny the allegations contained in this paragraph.

41.  The Defendants deny the allegations contained in this paragraph.

42.  The Defendants deny the allegations contained in this

paragraph.

### Prayers For Relief

The remainder of the complaint contains a Prayer for Relief which requires no response.  To the extent that the Request for Relief sets forth allegations that require a responsive pleading those allegations are denied.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Plaintiff's complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The Plaintiff's claims are barred by the applicable statute of limitations.

### Third Affirmative Defense

The Plaintiff's claims are barred by laches or estoppel.

### Fourth Affirmative Defense

The Plaintiff's claims are barred by the doctrine of unclean hands.

### Fifth Affirmative Defense

The Plaintiff failed to mitigate its damages.

### Sixth Affirmative Defense

The Plaintiff has waived any right to assert the claims

alleged in its complaint.

WHEREFORE, the Defendants request that this Court:

1. Dismiss with prejudice the Plaintiff's complaint;

2. Award the Defendants interest, costs and attorney's fees; and

3. Award the Defendants such other and further relief as this Court deems just and appropriate.

**DEFENDANTS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

CASH TECHNOLOGIES, INC. AND
COIN BANK AUTOMATED SYSTEMS, INC.,
by their attorneys,

*Paul F. Beckwith*

Paul F. Beckwith, BBO #:  550186
Kenneth J. Martin, BBO #:  636643
COOLEY MANION JONES LLP
21 Custom House St.
Boston, MA 02110
(617) 737-3100

and

Brian C. Daughney, Esq.
GOLDSTEIN & DiGIOIA, LLP
369 Lexington Avenue - 18th Floor
New York, NY 10017
(212) 599-3322

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on *10/23/2000* .
*Paul F. Beckwith*

Dated: *10/23/2000*

50109

-6-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAW'S SUPERMARKETS, INC.,  )
    Plaintiff,  )
      )
v.  )    Civil Action No: 00CV11571 WGY
      )
CASH TECHNOLOGIES, INC. AND  )
COIN BANK AUTOMATED SYSTEMS,  )
INC.,  )
    Defendants.  )

## ANSWER & JURY DEMAND

The Defendants, Cash Technologies, Inc. and Coin Bank Automated Systems, Inc., hereby respond to the Plaintiff's Complaint as follows:

### The Parties

1.    The Defendants are without sufficient information to admit or deny the allegations contained in this paragraph and therefore deny the same.

2.    Admitted.

3.    Admitted.

### Jurisdiction and Venue

4.    This paragraph contains a conclusion of law which requires no response.

5.    This paragraph contains a conclusion of law which requires no response.



5

6.   This paragraph contains a conclusion of law which requires no response.

## **Facts**

7.   Admitted.

8.   Admitted.

9.   Admitted.

10.   Admitted.

11.   Admitted.

12.   Admitted.

13.   The Defendants deny the allegations contained in this paragraph.

14.   The Defendants deny the allegations contained in this paragraph.

15.   The Defendants deny that they defaulted on the agreement.

16.   The Defendants deny that they defaulted on the agreement.

17.   Admitted.

18.   Admitted.

19.   The Defendants deny the allegations contained in this paragraph.

20.   Cash Technologies denies that it is responsible for Coin Bank's obligations.

-2-

21.  Admitted.

22.  The Defendants state that the agreement speaks for itself.

23.  The Defendants state that the agreement speaks for itself.

24.  The Defendants deny that they defaulted on the agreement.

25.  The Defendants deny that they defaulted on the agreement.

26.  The Defendants deny that they defaulted on the agreement.

27.  The Defendants deny that they defaulted on the agreement.

28.  The Defendants deny that they defaulted on the agreement.

29.  The Defendants deny the allegations contained in this paragraph.


## COUNT I

### Breach of Contract Against CoinBank

30.  The Defendants reincorporate and reallege their responses to paragraphs 1 through 29.

31.  The Defendants deny the allegations contained in this paragraph.

32.   The Defendants deny the allegations contained in this paragraph.

33.   The Defendants deny the allegations contained in this paragraph.

34.   The Defendants deny the allegations contained in this paragraph.

## COUNT II

### Breach of Contract Against Cash Technologies

35.   The Defendants reincorporate and reallege their responses to paragraphs 1 through 34.

36.   The Defendants deny the allegations contained in this paragraph.

37.   The Defendants deny the allegations contained in this paragraph.

38.   The Defendants deny the allegations contained in this paragraph.

39.   The Defendants deny the allegations contained in this paragraph.

40.   The Defendants deny the allegations contained in this paragraph.

41.   The Defendants deny the allegations contained in this paragraph.

42.   The Defendants deny the allegations contained in this

paragraph.

## Prayers For Relief

The remainder of the complaint contains a Prayer for Relief which requires no response.  To the extent that the Request for Relief sets forth allegations that require a responsive pleading those allegations are denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Plaintiff's complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The Plaintiff's claims are barred by the applicable statute of limitations.

### Third Affirmative Defense

The Plaintiff's claims are barred by laches or estoppel.

### Fourth Affirmative Defense

The Plaintiff's claims are barred by the doctrine of unclean hands.

### Fifth Affirmative Defense

The Plaintiff failed to mitigate its damages.

### Sixth Affirmative Defense

The Plaintiff has waived any right to assert the claims

alleged in its complaint.

WHEREFORE, the Defendants request that this Court:

1.   Dismiss with prejudice the Plaintiff's complaint;

2.   Award the Defendants interest, costs and attorney's
     fees; and

3.   Award the Defendants such other and further relief as
     this Court deems just and appropriate.

**DEFENDANTS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

CASH TECHNOLOGIES, INC. AND
COIN BANK AUTOMATED SYSTEMS, INC.,
by their attorneys,

*Paul F. Beckwith*

Paul F. Beckwith, BBO #:   550186
Kenneth J. Martin, BBO #:   636643
COOLEY MANION JONES LLP
21 Custom House St.
Boston, MA 02110
(617) 737-3100

and

Brian C. Daughney, Esq.
GOLDSTEIN & DiGIOIA, LLP
369 Lexington Avenue - 18th Floor
New York, NY 10017
(212) 599-3322

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on *10/23/2000* .
*Paul F. Beckwith*

Dated: *10/23/2000*

50109

-6-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAW'S SUPERMARKETS, INC.,          )
    Plaintiff,                      )
                                    )
v.                                  )   Civil Action No: 00CV11571 WGY
                                    )
CASH TECHNOLOGIES, INC. AND         )
COIN BANK AUTOMATED SYSTEMS,        )
INC.,                               )
    Defendants.                     )

## ANSWER & JURY DEMAND

    The Defendants, Cash Technologies, Inc. and Coin Bank Automated Systems, Inc., hereby respond to the Plaintiff's Complaint as follows:

### The Parties

    1.    The Defendants are without sufficient information to admit or deny the allegations contained in this paragraph and therefore deny the same.

    2.    Admitted.

    3.    Admitted.

### Jurisdiction and Venue

    4.    This paragraph contains a conclusion of law which requires no response.

    5.    This paragraph contains a conclusion of law which requires no response.



5

6.    This paragraph contains a conclusion of law which requires no response.

### Facts

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    The Defendants deny the allegations contained in this paragraph.

14.    The Defendants deny the allegations contained in this paragraph.

15.    The Defendants deny that they defaulted on the agreement.

16.    The Defendants deny that they defaulted on the agreement.

17.    Admitted.

18.    Admitted.

19.    The Defendants deny the allegations contained in this paragraph.

20.    Cash Technologies denies that it is responsible for Coin Bank's obligations.

-2-

21.   Admitted.

22.   The Defendants state that the agreement speaks for itself.

23.   The Defendants state that the agreement speaks for itself.

24.   The Defendants deny that they defaulted on the agreement.

25.   The Defendants deny that they defaulted on the agreement.

26.   The Defendants deny that they defaulted on the agreement.

27.   The Defendants deny that they defaulted on the agreement.

28.   The Defendants deny that they defaulted on the agreement.

29.   The Defendants deny the allegations contained in this paragraph.


## COUNT I

### Breach of Contract Against CoinBank

30.   The Defendants reincorporate and reallege their responses to paragraphs 1 through 29.

31.   The Defendants deny the allegations contained in this paragraph.

-3-

32.   The Defendants deny the allegations contained in this paragraph.

33.   The Defendants deny the allegations contained in this paragraph.

34.   The Defendants deny the allegations contained in this paragraph.


## COUNT II

### Breach of Contract Against Cash Technologies

35.   The Defendants reincorporate and reallege their responses to paragraphs 1 through 34.

36.   The Defendants deny the allegations contained in this paragraph.

37.   The Defendants deny the allegations contained in this paragraph.

38.   The Defendants deny the allegations contained in this paragraph.

39.   The Defendants deny the allegations contained in this paragraph.

40.   The Defendants deny the allegations contained in this paragraph.

41.   The Defendants deny the allegations contained in this paragraph.

42.   The Defendants deny the allegations contained in this

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )   CRIMINAL NO. 1:01CR10052-GAO
            V.                )   VIOLATION:
                              )   18 U.S.C. § 2113(a)--
MICHAEL FONDANOVA             )     Bank Robbery

INDICTMENT

COUNT ONE:   (18 U.S.C. § 2113(a)-- Bank Robbery)

The Grand Jury charges that:

On or about August 6, 1998, at Dorchester, in the District

of Massachusetts,

MICHAEL FONDANOVA,

defendant herein, by force and violence and by intimidation, did

take from the person and presence of another approximately

$18,988.90, money belonging to, and in the care, custody,

control, management and possession of, the Delta Wye Federal

Credit Union, 256 Freeport Street, Dorchester, Massachusetts, a

state-chartered credit union the accounts of which were then

insured by the National Credit Union Administration Board.

All in violation of Title 18, United States Code, Section

2113(a).

10

## A TRUE BILL

_____
Foreperson of the Grand Jury


_____
James F. Lang
Assistant United States Attorney


DISTRICT OF MASSACHUSETTS:                February 7, 2001 @ 12:00 PM

Returned into the District Court by the Grand Jurors and filed.


_____
Deputy Clerk

JS 45 (1/96) (Revised U.S.D.C. MA 8/27/96)

**Criminal Case Cover Sheet**          **U.S. District Court — District of Massachusetts**

Place of Offense          Category No. __II__          Investigating Agency ____FBI____

City _Dorchester_                    Related Case Information:

County _Suffolk_          Superseding Indictment ____ Docket No. _1:01CR10052-GAO_
                          Original Defendant _____ New Defendant _____
                          Magistrate Judge Case Number _00-M-0466-RBC_____
                          Search Warrant Case Number _____
                          R 20/ R 40 from District of _____

Defendant Information:
Defendant Name          ____Michael Fondanova_____          Juvenile: _____ Yes _____ No _X_
Alias Name              _____
Address                 ___Incarcerated_____

Birthdate _5/13/62__ SS #_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_____ Sex _M__ Race _W__ Nationality _USA___

Defense Counsel if known: __Elliot Weinstein_____

Address: __228 Lewis Wharf, Boston, MA 02110_____

U.S. Attorney Information: __James F. Lang_____ Phone No. _(617) 748-3175_

Address: __1 Courthouse Way, Suite 9200, Boston, MA 02210_____

Bar No. _546988_____          Interpreter:     _X_ No   ☐ Yes

List Language and/or dialect: _____ Matter to be SEALED:  _X_ No   ☐ Yes

        ☐ Warrant Requested          ☐ Regular Process          _X_ In Custody

Arrest Date _____

        In Federal Custody as of _____ in _____

_X_     In State Custody at _Suffolk County House of Correction_____

_X_ Serving Sentence   ☐ Awaiting Trial   ☐   On Pretrial Release

Offenses Charged:     ☐ Complaint     ☐ Information     _X_ Indictment

Total # of Counts:     ☐ Petty_____     ☐ Misdemeanor_____     _X_ Felony _1_

Date: _February 7, 2001_     Signature of AUSA: _____
                              Continue on Page 2 for Entry of U.S.C. Citations

(Revised U.S.D.C. MA 8/27/96) Page 2 of 2

District Court Case Number (To be filled in by deputy clerk): ___*1:00CR10052-GAO*___

Name of Defendant ___Michael Fondanova___

## U.S.C. CITATIONS

| | U.S.C. Citations | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 2113(a) | Bank Robbery | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |
| Set 16 | | | |
| Set 17 | | | |
| Set 18 | | | |
| Set 19 | | | |
| Set 20 | | | |
| Set 21 | | | |
| Set 22 | | | |
| Set 23 | | | |

**ADDITIONAL INFORMATION:**

___(crjs45rv.cov - 9/3/96)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
            V.                    )
                                  )
MICHAEL FONDANOVA                 )

CRIMINAL NO. 1:01CR10052-GAO
VIOLATION:
18 U.S.C. § 2113(a)--
  Bank Robbery

### INDICTMENT

COUNT ONE:     (18 U.S.C. § 2113(a)-- Bank Robbery)

The Grand Jury charges that:

On or about August 6, 1998, at Dorchester, in the District

of Massachusetts,

MICHAEL FONDANOVA,

defendant herein, by force and violence and by intimidation, did

take from the person and presence of another approximately

$18,988.90, money belonging to, and in the care, custody,

control, management and possession of, the Delta Wye Federal

Credit Union, 256 Freeport Street, Dorchester, Massachusetts, a

state-chartered credit union the accounts of which were then

insured by the National Credit Union Administration Board.

All in violation of Title 18, United States Code, Section

2113(a).

10

A TRUE BILL

_____
Foreperson of the Grand Jury

_____
James F. Lang
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS:                 February 7, 2001 @ 12:00PM

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk

JS 45 (1/96) (Revised U.S.D.C. MA 8/27/96)

# Criminal Case Cover Sheet

**U.S. District Court - District of Massachusetts**

Place of Offense                 Category No. __II__              Investigating Agency ____FBI____

City _Dorchester_                    Related Case Information:

County _Suffolk_                   Superseding Indictment ____ Docket No. _1:01CR10052-GAO_
                                   Original Defendant _____ New Defendant _____
                                   Magistrate Judge Case Number _00-M-0466-RBC_
                                   Search Warrant Case Number _____
                                   R 20/ R 40 from District of _____

Defendant Information:
Defendant Name         ____Michael Fondanova____        Juvenile: _____ Yes ____ No _X_
Alias Name
Address                    __Incarcerated__

Birthdate _5/13/62_ SS #_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_        Sex _M_    Race _W_   Nationality _USA_

Defense Counsel if known:___Elliot Weinstein_____

Address:  __228 Lewis Wharf, Boston, MA 02110__

U.S. Attorney Information:   James F. Lang_____        Phone No. _(617) 748-3175_

Address:  _1 Courthouse Way, Suite 9200, Boston, MA 02210_

Bar No. _546988_                    Interpreter:    _X_ No   ☐ Yes

List Language and/or dialect: _____ Matter to be SEALED: _X_ No   ☐ Yes

☐ Warrant Requested      ☐ Regular Process      **X** In Custody

Arrest Date _____

   In Federal Custody as of _____ in _____

**X**   In State Custody at _Suffolk County House of Correction_

**X** Serving Sentence   ☐ Awaiting Trial   ☐   On Pretrial Release

Offenses Charged:   ☐ Complaint   ☐ Information   **X** Indictment

Total # of Counts:   ☐ Petty_____   ☐ Misdemeanor_____   **X** Felony _1_

Date:  _February 7, 2001_      Signature of AUSA:
                   Continue on Page 2 for Entry of U.S.C. Citations

(Revised U.S.D.C. MA 8/27/96) Page 2 of 2

District Court Case Number (To be filled in by deputy clerk): _1:00CR10052-GAO_

Name of Defendant __Michael Fondanova_____

## U.S.C. CITATIONS

| | U.S.C. Citations | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 2113(a) | Bank Robbery | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |
| Set 16 | | | |
| Set 17 | | | |
| Set 18 | | | |
| Set 19 | | | |
| Set 20 | | | |
| Set 21 | | | |
| Set 22 | | | |
| Set 23 | | | |

**ADDITIONAL INFORMATION:**

___(crjs45rv.cov - 9/3/96)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. *01- 10051 - NG* |
| v. | ) | VIOLATION: |
| MERILIO ANDRES BAUTISTA-GUZMAN, a/k/a RAFAEL PAREDES | ) | 8 U.S.C. § 1326 Illegal Re-entry of Deported Alien |

## INDICTMENT

**COUNT ONE**:   8 U.S.C. § 1326 -- Illegal Re-entry of Deported Alien

The Grand Jury charges that:

On or about November 16, 2000, at Boston, in the District of

Massachusetts,

MERILIO ANDRES BAUTISTA-GUZMAN,
a/k/a RAFAEL PAREDES,

defendant herein, being an alien and having been excluded,

deported and removed from the United States, was found in the

United States without having received the express consent of the

United States Attorney General to reapply for admission to the

United States.

All in violation of Title 8, United States Code, Section

1326.



A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
TIMOTHY Q. FEELEY
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; February 7, 2001. @ 12:00 PM

Returned into the District Court by the Grand Jurors and

filed.

_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH LISBON
            Plaintiff

        V.

                                    CIVIL ACTION: 99-10602-PBS

LUCENT TECHNOLOGIES, INC., et al.
            Defendants


## JUDGMENT

SARIS, U.S.D.J.                          February 7, 2001


The Court having allowed the defendants' motion for summary judgment on October 27,

2000, final judgment is hereby entered in favor of the defendants.


By the Court,


DEPUTY CLERK


judgment.sj

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 01-10090MLW

SAMUEL R. HATEM,  )
　　　　　　　　　 )
　　　Plaintiff　　 )
　　　　　　　　　 )
v.　　　　　　　　)
　　　　　　　　　 )
METROPOLITAN LIFE INSURANCE )
COMPANY and RAYTHEON )
TECHNICAL SERVICES, )
　　　　　　　　　 )
　　　Defendants　 )

## ANSWER OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY AND RAYTHEON TECHNICAL SERVICES COMPANY

Defendants Metropolitan Life Insurance Company ("MetLife") and Raytheon Technical

Services Company ("Raytheon") answer the complaint as follows.

1.　　　Defendants currently lack knowledge or information sufficient to form a belief as

to the truth of the allegations of this paragraph.

2.　　　MetLife admits that it does business in Massachusetts.　Otherwise, denied.

3.　　　Raytheon admits that it is a corporation that does business in Massachusetts.

Otherwise, denied.

4.　　　Defendants admit that MetLife is the insurer for the Raytheon Company Short

Term Disability Plan.　Defendants state that the second sentence of this paragraph states a legal

conclusion as to which no response is necessary.　Otherwise, denied.

5.　　　Denied.

6.　　　Denied.

7.      Defendants deny the first sentence of this paragraph.  Defendants state that the second sentence of this paragraph states a legal conclusion as to which no response is necessary.

8.      Denied.

9.      Denied.

10.     Admitted.

11.     Defendants admit that plaintiff worked as an expediter and a supervisor. Otherwise, denied.

12.     Denied.

13.     Defendants admit that plaintiff's job has time constraints.  Otherwise, denied.

14-20.  Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

21.     Defendants admit that plaintiff was absent from work beginning on February 12, 2000.  Otherwise, denied.

22.     Admitted.

23.     Denied.

24.     Admitted.

25.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

26.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

27.     Defendants state the MetLife's responsibilities are set forth in the plan documents and therefore deny the allegations of this paragraph.

28.    Defendants state that MetLife's correspondence speaks for itself and therefore deny the allegations of this paragraph.

29.    Defendants state that MetLife's correspondence speaks for itself and therefore deny the allegations of this paragraph.

30.    Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

31.    Defendants state that MetLife's correspondence speaks for itself and therefore deny the allegations of this paragraph.

32.    Defendants state that plaintiff's appeal, including any documents submitted in connection therewith, speak for themselves and therefore deny the allegations of this paragraph.

33.    Defendants state that Dr. Masterson's report speaks for itself and therefore deny the allegations of this paragraph.

34.    Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

35.    Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

36.    Denied.

37.    Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

38.    Admitted.

39.    Admitted.

40-52. Denied.

53.     Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

54.     Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

55-61. Denied.

62.     Defendants state that Raytheon's Employer's Statement speaks for itself and therefore deny the allegations of this paragraph.

63.     Denied.

64.     Denied.

65.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

66.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

67.     Admitted.

68-70. Denied.

71-73. Defendants state that Raytheon's employment policies speak for themselves and therefore deny the allegations of this paragraph.

74.     Defendants state the plan documents speak for themselves and therefore deny the allegations of this paragraph.

75.     Denied.

76.     Denied.

77-78. Defendants state that Raytheon's employment policies speak for themselves and therefore deny the allegations of this paragraph.

79.    Denied.

## COUNT I

80.    Defendants repeat their responses to paragraphs 1-79 above.

81-84. Denied.

## COUNT II

85.    Defendants repeat their responses to paragraphs 1-79 above.

86-89. Denied.

## COUNT III

90.    Defendants repeat their responses to paragraphs 1-79 above.

91-93. Denied.

## COUNT IV

94.    Defendants repeat their responses to paragraphs 1-79 above.

95-96. Denied.

## COUNT V

97.    Defendants repeat their responses to paragraphs 1-79 above.

98-102.  Denied.

## **AFFIRMATIVE DEFENSES**

### First Affirmative Defense

The plaintiff's complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The plaintiff's remedies for any of his claims are limited solely to those available under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as those claims are governed exclusively by ERISA.

### Third Affirmative Defense

The plaintiff's claims are barred by the terms of the applicable documents and instruments governing the plan.

### Fourth Affirmative Defense

The defendants discharged their duties with respect to the plan in the interest of the plan participants and their beneficiaries, and in doing so, the defendants acted in accordance with the documents and instruments governing the plan.

### Fifth Affirmative Defense

The plaintiff's claims must fail because the defendants' claims determinations were not arbitrary, capricious, unreasonable, or made in bad faith.

### Sixth Affirmative Defense

The plaintiff has no right to a jury trial under ERISA and his jury demand should be stricken.

WHEREFORE, defendants respectfully request that the Court dismiss the complaint, with prejudice, and award defendants their attorneys fees and costs.

METROPOLITAN LIFE INSURANCE
COMPANY and RAYTHEON TECHNICAL
SERVICES COMPANY,
By their attorneys,


James F. Kavanaugh, Jr.
BBO# 262360
Stephen S. Churchill
BBO# 564158
CONN KAVANAUGH ROSENTHAL
  PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA  02109
(617) 482-8200

Dated: February 7, 2001

CKDOCS:95395.1

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on  2/7/01

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 01-10090MLW

SAMUEL R. HATEM,          )
                           )
     Plaintiff            )
                           )
v.                       )
                           )
METROPOLITAN LIFE INSURANCE  )
COMPANY and RAYTHEON       )
TECHNICAL SERVICES,        )
                           )
     Defendants         )

DOCKETED

## ANSWER OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY AND RAYTHEON TECHNICAL SERVICES COMPANY

Defendants Metropolitan Life Insurance Company ("MetLife") and Raytheon Technical Services Company ("Raytheon") answer the complaint as follows.

1.     Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

2.     MetLife admits that it does business in Massachusetts.  Otherwise, denied.

3.     Raytheon admits that it is a corporation that does business in Massachusetts. Otherwise, denied.

4.     Defendants admit that MetLife is the insurer for the Raytheon Company Short Term Disability Plan.  Defendants state that the second sentence of this paragraph states a legal conclusion as to which no response is necessary.  Otherwise, denied.

5.     Denied.

6.     Denied.

53.     Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

54.     Defendants currently lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

55-61. Denied.

62.     Defendants state that Raytheon's Employer's Statement speaks for itself and therefore deny the allegations of this paragraph.

63.     Denied.

64.     Denied.

65.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

66.     Defendants state that the plan documents speak for themselves and therefore deny the allegations of this paragraph.

67.     Admitted.

68-70. Denied.

71-73. Defendants state that Raytheon's employment policies speak for themselves and therefore deny the allegations of this paragraph.

74.     Defendants state the plan documents speak for themselves and therefore deny the allegations of this paragraph.

75.     Denied.

76.     Denied.

77-78. Defendants state that Raytheon's employment policies speak for themselves and therefore deny the allegations of this paragraph.

79.     Denied.

## COUNT I

80.     Defendants repeat their responses to paragraphs 1-79 above.

81-84. Denied.

## COUNT II

85.     Defendants repeat their responses to paragraphs 1-79 above.

86-89. Denied.

## COUNT III

90.     Defendants repeat their responses to paragraphs 1-79 above.

91-93. Denied.

## COUNT IV

94.     Defendants repeat their responses to paragraphs 1-79 above.

95-96. Denied.

## COUNT V

97.     Defendants repeat their responses to paragraphs 1-79 above.

98-102. Denied.

## **AFFIRMATIVE DEFENSES**

### First Affirmative Defense

The plaintiff's complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The plaintiff's remedies for any of his claims are limited solely to those available under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as those claims are governed exclusively by ERISA.

### Third Affirmative Defense

The plaintiff's claims are barred by the terms of the applicable documents and instruments governing the plan.

### Fourth Affirmative Defense

The defendants discharged their duties with respect to the plan in the interest of the plan participants and their beneficiaries, and in doing so, the defendants acted in accordance with the documents and instruments governing the plan.

### Fifth Affirmative Defense

The plaintiff's claims must fail because the defendants' claims determinations were not arbitrary, capricious, unreasonable, or made in bad faith.

### Sixth Affirmative Defense

The plaintiff has no right to a jury trial under ERISA and his jury demand should be stricken.

WHEREFORE, defendants respectfully request that the Court dismiss the complaint, with prejudice, and award defendants their attorneys fees and costs.

METROPOLITAN LIFE INSURANCE
COMPANY and RAYTHEON TECHNICAL
SERVICES COMPANY,
By their attorneys,

James F. Kavanaugh, Jr.
BBO# 262360
Stephen S. Churchill
BBO# 564158
CONN KAVANAUGH ROSENTHAL
 PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA  02109
(617) 482-8200

Dated: February 7, 2001

CKDOCS:95395.1

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 2/7/01

7

6.     Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 6.

7.     Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 7.

8.     Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 8.

9.     Denied.

10.    Denied.

11.    Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 11.

12.    Denied.

13.    Defendant Chargeurs is without sufficient information to admit or deny the allegations of paragraph 13.

14.    Denied.

WHEREFORE, Defendant Chargeurs requests that this Court dismiss the Complaint, that it not otherwise be held liable for any losses or claims of Plaintiff and that it award Defendant Chargeurs its costs and attorneys fees.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The complaint should be dismissed as the Court has no jurisdiction over Defendant

Chargeurs.

### Third Affirmative Defense

The Complaint should be dismissed for insufficient service of process upon Defendant

Chargeurs.

### Fourth Affirmative Defense

The Complaint should be dismissed due to insufficiency of service over Defendant

Chargeurs.

### Fifth Affirmative Defense

The Complaint should be dismissed as Plaintiff is estopped.

### Sixth Affirmative Defense

The Complaint should be dismissed as there is accord and satisfaction.

### Seventh Affirmative Defense

The Complaint should be dismissed as insufficient demand has been made pursuant to the

Guaranty.

Defendant Chargeurs hereby requests the Court dismiss it or otherwise enter judgment,

including attorneys fees, on its behalf.

### CROSSCLAIM AGAINST DEFENDANT DOMINION TEXTILE, INC.

For its Crossclaim against Defendant Dominion Textile, Inc. ("Defendant Dominion"),

Defendant Chargeurs states as follows:

1.      Defendant Dominion guaranteed obligations of DHJ Plastics, Inc. arising pursuant

to a lease between the Plaintiff and DHJ Plastics, Inc.

2.      The Guaranty obligates Defendant Dominion to Plaintiff for certain liabilities

3

relating to the lease between Plaintiff and DHJ Plastics, Inc.

3.     To the extent that Defendant Chargeurs is obligated to Plaintiff, pursuant to the

Guaranty and other contractual or legal obligations, Defendant Dominion shall indemnify

Defendant Chargeurs and hold harmless Defendant Chargeurs.

WHEREFORE, Defendant Chargeurs requests that this Court enter judgment that

Defendant Dominion shall indemnify, defend or hold harmless Defendant Chargeurs for any

liability hereunder, including its costs and attorneys fees.

CHARGEURS TEXTILES S.A.,

By their attorneys,

Donald R. Pinto, Jr., BBO #548421
Robert B. Foster, BBO #563347
RACKEMANN, SAWYER & BREWSTER, P.C.
One Financial Center
Boston, MA  02111
(617) 542-2300

Dated:  December 14, 2000

Certificate of Service

I, Robert B. Foster, counsel for the defendant Chargeurs Textiles S.A., hereby certify that
I have this day served a copy of the foregoing upon all other parties by mail.

Robert B. Foster

G:\LIT\10389\2\A0088735.DOC

4